[Crim. No. 4109.   Second Dist., Div. One.   July 22, 1947.]

THE PEOPLE, Respondent, v. CLARENCE LESTER HAWKER, Appellant.

Chase, Rotchford, Downen & Chase, Donn B. Downen, Jr., and Robert E. Moore, Jr., for Appellant.

Fred N. Howser, Attorney General, and Ward Sullivan, Deputy Attorney General, for Respondent.

YORK, P. J.—Defendant was charged with the crime of rape and was found guilty thereof by a jury. He appeals from the judgment of conviction and from the order denying his motion for a new trial.

It is here contended (1) that the testimony of the prosecutrix, insofar as it attempts to identify the appellant as her assailant, is so inherently improbable as to suggest that the verdict of the jury based thereon was the result of passion and prejudice; (2) that the testimony of other prosecution witnesses indicates a bias and prejudice on the part of each against the appellant and in favor of the prosecutrix; (3) that the trial court erred with respect to the admission and exclusion of evidence and in refusing to give certain instructions to the jury.

The prosecutrix, a college student of the age of 20 years and a resident of La Crescenta, testified that she was working as a waitress in Glendale on the night of May 17, 1946; that she finished her work at 12:30 a.m. of May 18th and boarded the last bus which left Glendale at 1:05 a.m.; that she alighted at the corner of Pennsylvania Avenue and Foothill Boulevard in La Crescenta, at which point Foothill runs approximately east and west and Pennsylvania, north and south, and walked in a northerly direction on Pennsylvania Avenue toward her home situated about a mile away. When she had walked about a city block a black two-door sedan passed her, traveling in the same direction; that shortly after passing her, the automobile backed into a driveway on the east side of Pennsylvania; that said prosecutrix continued to walk up the hill past the sedan parked in the driveway; that when she passed the car, the lights thereof "were off," but she "noticed a man standing beside the car. I thought he lived there and was just going home so I continued walking up the hill." When the prosecutrix had proceeded about a quarter of a block or so, a man came up quietly behind her, "put a gun in my back and told me to go over to the side of the road or he would shoot"; that prosecutrix turned around "when he spoke to me and he still had the gun pointed at me. . . . He had a gun in his hand. . . . It was a pistol. . . . he told me to hurry up or he would shoot me. . . . I told him, you know, leave me alone, and he kept telling me to shut up. . . . then he led me over to the side of the road, kind of pushed me along, he was behind me and had the gun in my back. . . . forced me into a lying position . . . then, he committed an act of sexual intercourse. . . . Well, he said, 'Don't move for five minutes,'

and then he backed away holding the gun and then I left and went to the nearest place, the nearest house. . . . A young couple were there. . . . They let me in to use it (the telephone) so I phoned up the Sheriff's office,'' and some officers responded to the call shortly thereafter.

Prosecutrix further testified that there was ''a big street light at the corner of Foothill and Pennsylvania; that Pennsylvania was being repaired and there were ''red lanterns up and down the street,'' and that there was sufficient light for her to see the face of her assailant. At this point she indicated appellant Hawker as such assailant. Further testifying, she stated ''his face to me is a face of horror and I could tell it very well. . . . He has a rather peculiar twitch about his face, I don't know just what he does but his face twitches''; that he was wearing a dark suit and a workman's cap with a visor. A cap of similar appearance was admitted in evidence. In response to the question ''Was there any other means of identification that you recall?,'' prosecutrix stated: ''Well, besides his face I noticed his build, his walk, and also I noticed the lines in his cap. Q. Was there light so that you could distinguish his features? A. Yes, I noticed even the lines in his cap. I noticed his features.''

On cross-examination, prosecutrix testified that there was no moonlight and with the exception of the street lanterns it was ''pretty dark,'' but that there were overhanging clouds, which were quite low and therefore there ''was a light out, and you could see things very clearly'' and it was not too dark for her to distinguish the features of her assailant; that his face was very close to hers at times when she was lying on the ground; that she observed appellant when he walked away from her ''until he got beyond the trees and then the view was obstructed. . . . He had rather a stumbling walk''; that she identified appellant as her assailant at the sheriff's office in Montrose a few days after the attack.

Deputy Sheriff Ward Agan, who with Officer Garrick responded to the prosecutrix' telephone call on the night of the attack, testified that at the scene of the crime the visibility was good and he was able to distinguish features at a distance of 8 or 9 feet; that there was a moon but the sky was overcast, a sort of haze; that he and Officer Garrick picked up a belt belonging to prosecutrix which could be plainly seen without a flashlight. These officers both testified as to the appearance of the prosecutrix at the home of Mrs. Verna where they went in response to a telephone call on May 18,

1946, at about 1:45 or 1:55 a.m. The record discloses that said officers arrested appellant on May 23d in front of a cafe at 3645 Foothill Boulevard, La Crescenta; at which time he was wearing the cap with a visor introduced in evidence; that after appellant left the cafe, he walked to his black two-door Ford sedan and got into the car where the arrest was made.

Appellant's main defense was an alibi for the night of May 17, and the early morning of May 18, 1946. He testified that he spent the afternoon of May 17th, accompanied by his sister-in-law, at Forest Lawn Cemetery looking for a crypt in which to place his wife's remains. In this connection defendant's Exhibit A was introduced in evidence, i.e., a receipt from a salesman employed by Forest Lawn for money paid on account of said crypt dated May 17, 1947. Appellant further testified that he took his sister-in-law home, had dinner with some friends and returned to his room at the Sperling residence about 9 o'clock in the evening and went to bed; that about 12:30 he awakened Mrs. Sperling and she joined him in the kitchen for a midnight snack at which time they discussed Forest Lawn and other matters until about 3 a.m. when he retired.

Mrs. Florence Sperling testified that she lived at a certain address in Tujunga which is 2 or 3 miles distant from Pennsylvania Avenue and Foothill Boulevard; that appellant was living at her house in May of 1946; that on or about May 23d, some police officers came to the witness' house with appellant and searched the latter's room; that when appellant was released from jail he returned to Mrs. Sperling's house and told her, Mrs. Lobato and other persons rooming there he had been accused of rape and that "he had to have an alibi as to what he did that night or where he was that night." A few days later, appellant told Mrs. Sperling that he had thought it over and he knew what he had done on the night the rape occurred, and he then called her attention to an incident where another roomer had locked the bumpers of his car with the car of appellant while the latter car was parked outside of Mrs. Sperling's house and appellant had gotten out of bed and helped to disengage the bumpers of the two cars. Appellant stated to the witness that this incident occurred on the night of May 17th. The next day Mrs. Sperling discussed this with Mary Lobato and thereafter told appellant that the car incident occurred on the night of May 9th, and not May 17th; that appellant then told the witness that on the night of May 17th, he had returned home rather late

from being at Forest Lawn Cemetery all day, and around 2 on the morning of May 18th he had asked the witness if he could make some coffee in her kitchen, to which she acquiesced, "so he said that would verify the time he was at home that particular night."

Mrs. Sperling, after detailing the conversation and midnight snack with appellant in her kitchen, testified that she could not fix the date of the early morning conversation that was held between 12:30 and 2:30 as May 17th; that she could not remember whether it took place on the 17th, 18th, 13th or 23d or what date exactly. Upon recross-examination by the prosecution, Mrs. Sperling testified that her conversation with appellant with respect to Forest Lawn did not take place on May 17th; that she did not "remember when it was . . . I had a very bad headache, a migraine headache and I had to go to a doctor and that is how I checked to find out what date it was that the conversation occurred because the doctor gave me a shot of pantopon for the headache and it was not on the 17th. That is why I know."

In connection with his first point, appellant urges that "the conditions on the night of the attack with respect to lighting were conducive to error in the identifying of another person, and the circumstances of the attack were such as to militate against an accurate, calm and well-considered identification."

Both the weight of evidence and the credibility of witnesses are matters entirely within the province of the triers of fact. As stated in 8 California Jurisprudence 590, section 582: "A question at law is presented which authorizes an appellate court in setting aside a verdict, if the testimony relied upon by the prosecution is apparently so improbable or false as to be incredible and to amount to no evidence at all. If it is of this character, the court is justified in assuming that the verdict obtained was the result of passion or prejudice rather than of a calm and dispassionate consideration of the evidence. To authorize a reversal under this rule, the improbability must appear very plainly. It has been said that the conclusions of the jury will be overruled only where the uncorroborated testimony of the complaining witness is so obviously and so inherently improbable as to leave no recourse, without self-stultification, except to reverse the judgment." See, also, *People* v. *Coley*, 61 Cal.App.2d 810, 813 [143 P.2d 755], in which it was stated that "It is not necessary for a witness to observe the features of a person charged with crime in order to identify him. There may well be other physical charac-

teristics that are sufficient for identification such as detailed by Spencer who said he could identify appellant by his general build, his shoulders, the way he moved and by the tattoo mark between the thumb and index finger of his left hand.'' The evidence in the instant case clearly establishes that the night was not too dark to distinguish features at a distance of 8 or 10 feet. The testimony of the prosecutrix relating to the identification of appellant as her assailant which is recited in the foregoing résumé is not inherently improbable. To the contrary, her testimony corroborated by that of other witnesses is legally sufficient to connect appellant with the crime charged against him and thereby to sustain the judgment of conviction.

Appellant calls attention to the fact that the prosecutrix was the daughter of a Los Angeles County probation officer, and urges that it was more than mere coincidence that the chief witnesses against him were respectively (a) the officers who received the complaint and made the arrest; (b) Mrs. Lobato, who disliked the appellant and had preconceived ideas of his guilt or lack of sanity and was also a former policewoman; (c) Mrs. Sperling, whose husband (a former police officer) did not like appellant and advised her to turn over to the sheriff's office the written statement of appellant with respect to the Forest Lawn and midnight snack incidents. He further urges that these witnesses were biased and prejudiced by reason of their current or former association, directly or indirectly, with police departments or other organizations sworn to the upholding and enforcement of the law.

The record herein does not sustain this contention of appellant. The arresting officers were necessary witnesses for the prosecution; Mrs. Sperling and Mrs. Lobato were associates of appellant's own selection; Mr. Sperling was not a witness at the trial, and Mrs. Sperling who did testify kept appellant in her home for several weeks after her husband disapproved of appellant's habit of entering the kitchen of the Sperling home in the early hours of the morning and disturbing other tenants.

Appellant contends that the prosecutor persisted at the trial in asking questions relative to the report made to the sheriff's office by Mrs. Sperling, and the difficulties that appellant had with Mr. Sperling, assigning as error the testimony elicited from Mrs. Sperling in this regard. Reference to that portion of the transcript to which appellant directs attention discloses that at that time Mrs. Sperling had been

called as a witness for the appellant and was under cross-examination by the prosecution. In overruling appellant's objection to this line of testimony, the court pointed out that bias, interest or prejudice could always be shown on such cross-examination, with which statement appellant's counsel agreed, and shortly thereafter stated: "I suppose I might just as well withdraw the objection and let counsel pursue it as far as he wants." This amounted to a waiver of the objection.

■ Appellant next assigns as error the admission of the testimony of Mrs. Sperling that appellant "never came in before one o'clock, as a rule," contending that such comment did not prove that appellant was keeping late hours and was not in the Sperling residence until after 1 o'clock on the morning of May 18, 1946, but that the admission of the statement was highly prejudicial because it undoubtedly left in the minds of the jury an inference to that effect.

This was also brought out while Mrs. Sperling was a witness for the defense and was under cross-examination by the prosecution. On direct examination this witness testified that she saw appellant every day and that he was in her home every night with the exception of two nights while he lived there other than the nights he was in jail; and that ever since he lived in her home, appellant had been very nervous, did not sleep and kept irregular hours. Having so testified, it was not improper to permit the prosecution to interrogate the witness with respect to the irregularity of the hours kept by appellant during the period in question.

■ Appellant also urges error in that the trial court "permitted the prosecution to re-examine Mrs. Sperling on the subject of her recollection of the exact date" of her conversation with appellant "concerning Forest Lawn and to elicit from her an assumption based upon hearsay information obtained from her doctor who treated her for migraine headache . . . in that it constituted a reversal of previous testimony of Mrs. Sperling to the general effect that *she did not recall* whether said conversation did occur on the night of May 17, 1946, or not." It will be noted that Mrs. Sperling was still on cross-examination, and also that after appellant's objection had been overruled, the prosecution was permitted to further cross-examine the witness along the same line without any objection from appellant, whose counsel then pursued the matter further by eliciting from said witness that the date of her conversation with appellant regarding Forest Lawn

was on May 26, 1946, instead of May 17th. If any error occurred in this respect, it was cured by the interrogation of the witness by appellant upon redirect examination.

Appellant complains that the court erred in certain of its rulings with respect to the exclusion of evidence. In each of the instances adverted to by appellant in his brief the excluded evidence had reference to immaterial matters, hence appellant suffered no prejudice as a result of the trial court's rulings thereon.

Appellant finally contends that the court committed prejudicial error in refusing to give to the jury certain instructions requested by him. An examination of the record discloses that the jury was fully and fairly instructed in the various aspects of the case, and that the substance of the refused instructions was included in the instructions given to the jury. In addition, the court gave the following cautionary instruction: "By reason of the fact that charges of the nature involved in this case can easily be made and are often difficult to disprove, I instruct you that it is your duty to examine with caution the testimony of the prosecuting witness. The fact that the charge here made, however, is one difficult to disprove should not deter you from rendering a verdict of guilty in the event that you are convinced by the evidence beyond a reasonable doubt that the defendant is guilty as charged."

Throughout this appeal, appellant has maintained that he was not sufficiently identified as the perpetrator of the crime of which he stands convicted, and that he was not present at the time and place of its commission, but was at home in the company of Mrs. Sperling.

The question of appellant's identity was one for the jury to determine, as was also the question of the soundness of his alibi and the weight to be given to the evidence adduced in support thereof. An examination of the entire record discloses that appellant was afforded a fair and impartial trial and that the verdict of the jury has not resulted in a miscarriage of justice.

For the reasons stated, the judgment and order appealed from are, and each of them is, affirmed.

Doran, J., and White, J., concurred.

A petition for a rehearing was denied August 5, 1947, and appellant's petition for a hearing by the Supreme Court was denied August 21, 1947.